Judy Scolnick (JS 0827)
SCOTT + SCOTT, LLP
29 West 57th Street
New York, NY 10019
Telephone: 212-223-6444

     and

Carl Beckwith (CB 9044)
BECKWITH & WOLF, LLP
1 Closter Commons #181
Closter, NJ 07624
Telephone: 201-338-2833

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## NEWARK DIVISION

| | |
|---|---|
| MARY E. CAIN, derivatively on behalf of SCHERING-PLOUGH CORPORATION, | Civil Action No. |
| Plaintiff, | Hon. __ |
| v. | |
| FRED HASSAN, HANS W. BECHERER, THOMAS J. COLLIGAN, C. ROBERT KIDDER, PHILIP LEDER, M.D., EUGENE R. MCGRATH, CARL E. MUNDY, JR., ANTONIO M. PEREZ, PATRICIA F. RUSSO, JACK L. STAHL, DR. CRAIG B. THOMPSON, KATHRYN C. TURNER, ROBERT F.W. VAN OORDT AND ARTHUR F. WEINBACH, | |
| Defendants. | **COMPLAINT AND** |
| and | **JURY TRIAL DEMAND** |
| SCHERING-PLOUGH CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff, by and through her attorneys, derivatively on behalf of Schering-Plough

Corporation ("Schering" or the "Company"), alleges upon personal knowledge as to herself and her

own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Company's press releases, Securities and Exchange Commission ("SEC") filings by Schering and media reports about the Company, the following:

### NATURE OF ACTION

1.       This is a shareholder derivative action brought on behalf of Schering by one of its shareholders against its Board of Directors (the "Board"), which is comprised of defendants Fred Hassan, Hans W. Becherer, Thomas J. Colligan, C. Robert Kidder, Philip Leder, M.D., Eugene R. McGrath, Carl E. Mundy, Jr., Antonio M. Perez, Patricia F. Russo, Jack L. Stahl, Dr. Craig B. Thompson, Kathryn C. Turner, Robert F.W. Van Oordt and Arthur F. Weinbach (collectively, the "Defendants"), to remedy Defendants' breaches of their fiduciary duties of loyalty, candor and due care,  and for their waste of corporate assets.

2.       Schering is a global health care and pharmaceutical company with prescription, consumer and animal health product sales of $10.5 billion in 2006.

3.       Beginning at least as early as April 1, 2006, and continuing through the present (the "Relevant Period"), certain of the Defendants, in breach of their fiduciary duties, devised and implemented a plan to suppress the findings of a study Schering commissioned that uncovered data contradicting the Company's public claims about two of its drugs, Zetia and Vytorin.

4.       Zetia (which was developed by Schering and approved by the FDA as an anti-cholesterol treatment) and Vytorin are manufactured, marketed, promoted, advertised and sold by Merck/Schering-Plough Pharmaceuticals, a joint venture of Schering and Merck & Co. Inc. ("Merck").  Vytorin combines Zetia with Zocor, a statin manufactured by Merck that is also designed to lower cholesterol.  Schering advertised and marketed both Zetia and Vytorin to the public and to physicians as a safe and effective treatment for lowering cholesterol.

5.       However, for more than a year, certain Defendants have known (but have failed to make public) that the Company's own study shows that Zetia does not reduce the fatty arterial plaques that can cause heart attack and stroke.  Despite this knowledge, Defendants caused the

Company to tout the Zetia *difference,* claiming that it would reduce arterial plaque.  The Company's failure to reveal that Zetia does not in fact reduce arterial plaque constitutes a deceptive practice employed by the Company to cause physicians to prescribe, and patients to take, Vytorin or Zetia.

6.      In or about 2004, Schering and Merck commissioned the ENHANCE study, which is an acronym for "Effect of Combination Exetimibe and High-Dose Simvastatin v. Simvastatin Alone on the Atherosclerotic Process in Patients with Heterozygous Familial Hypercholesterolemia." Schering and Merck commissioned the study to prove that Zetia and Vytorin would be effective in reducing accumulation of fatty plaque in patients' arteries.  Accumulated fatty plaque in the arteries can cause blockage in the arteries and can cause heart attacks and strokes.

7.      Although the ENHANCE trial was completed in April 2006, the Company did not release any results in either 2006 or 2007.  The Defendants' actions caused Schering to repeatedly fail to release the results of the study.

8.      Finally, on January 14, 2008, after pressure from numerous sources, including Congress, Schering released the results of the ENHANCE trial.  The ENHANCE study revealed that Zetia and Vytorin failed to slow the accumulation of fatty plaque in the arteries.  In addition, the study also demonstrated that rather than lowering the accumulation of fatty plaques in the arteries, Vytorin actually caused fatty plaques to accumulate nearly twice as fast, thus increasing, rather than decreasing, the patient's chances of suffering a heart attack and/or stroke.

9.      The House Energy and Commerce Committee, which is investigating Schering and Merck's delay, issued a statement that the negative results added to suspicions that the companies deliberately sat on their findings from the ENHANCE study.  Representative Bart Stupak of Michigan stated:  "In light of today's results, which were released nearly two years after the ENHANCE trial ended, it is easy to conclude that Merck and Schering-Plough intentionally sought to delay the release of this data."

10.      In the week after the disclosure of the results of the ENHANCE study, Schering's share price value dropped approximately 23.2%.

11.     As a result of Defendants' breaches of their fiduciary duties, Schering has been significantly and materially damaged.  First, the false statements and material omissions issued by the Company have resulted in Schering suffering massive losses and being named a defendant in several class action lawsuits alleging violations of securities and consumer protection statutes. These class action lawsuits, filed in federal district court in New Jersey and other federal district courts across the U.S., seek substantial damages and will cost the Company millions to defend and likely millions more to settle or satisfy any judgment against it.  Additionally, the Company is being investigated by the New York Attorney General with other state and federal investigations likely to be initiated.   These revelations of government investigations and violations of the securities and consumer protection laws have badly damaged Schering's corporate image and goodwill.

### JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over all claims asserted herein under 28 U.S.C. § 1332, because complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds $75,000.

13.     The Court has personal jurisdiction over each of the Defendants because Schering's principal place of business is located within this District, several of the Defendants are residents of the state of New Jersey, and all of the Defendants have conducted business in this District, including business related to the claims involving Schering.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Schering maintains its headquarters within this District and because many of the acts complained of herein occurred in this District.

### THE PARTIES

15.     Plaintiff Mary E. Cain is a resident of Georgia.  Plaintiff is currently and has been during the Relevant Period a shareholder of Schering.

16.     Nominal Defendant Schering is a New Jersey Corporation with its principal place of business at 2000 Galloping Hill Road, Kenilworth, NJ 07033.

17.     Defendant Fred Hassan ("Hassan"), upon information and belief, is a resident of New Jersey.  Hassan has been a Chairman of the Board and President and Chief Executive Officer ("CEO") of the Company since April 2003.  According to the 2007 Proxy, Hassan received over $29,657,926 in total compensation for his services as Chairman and CEO of the Company in 2006 and upon information and belief has received similar amounts for those positions in 2007. Moreover, according to the 2007 Proxy, Hassan directly or indirectly controls 3,667,466 shares of the common stock of Schering.

18.     Defendant Hans W. Becherer ("Becherer"), upon information and belief, is a resident of Florida.  Becherer has been a Director of the Company since 1989.  According to the 2007 Proxy, Becherer received $215,000 in total compensation for his services as Director of the Company in 2006 and upon information and belief has received similar amounts for his services in 2007. Moreover, according to the 2007 Proxy, Becherer directly or indirectly controls 64,136 shares of the common stock of Schering.

19.     Defendant Thomas J. Colligan ("Colligan"), upon information and belief, is a resident of New Jersey.  Colligan has been a Director of the Company since 2005.  According to the 2007 Proxy, Colligan received $215,000 in total compensation for his services as Director of the Company in 2006 and upon information and belief has received similar amounts for his services in 2007. Moreover, according to the 2007 Proxy, Colligan directly or indirectly controls 19,537 shares of the common stock of Schering.

20.     Defendant C. Robert Kidder ("Kidder"), upon information and belief, is a resident of Ohio.  Kidder has been a Director of the Company since 2005.  According to the 2007 Proxy, Kidder received $200,000 in total compensation for his services as Director of the Company in 2006 and upon information and belief has received similar amounts for his services in 2007.  Moreover, according to the 2007 Proxy, Kidder directly or indirectly controls 16,210 shares of the common stock of Schering.

21.     Defendant Philip Leder, M.D. ("Leder"), upon information and belief, is a resident of Massachusetts.  Leder has been a Director since 2003.  According to the 2007 Proxy, Leder received

$215,000 in total compensation for his services as Director of the Company in 2006 and upon information and belief has received similar amounts for his services in 2007. Moreover, according to the 2007 Proxy, Leder directly or indirectly controls 17,730 shares of the common stock of Schering.

22.     Defendant Eugene R. McGrath ("McGrath"), upon information and belief, is a resident of New York. McGrath has been a Director of Schering since 2000. According to the 2007 Proxy, McGrath received $215,000 in total compensation for his services as Director of the Company in 2006 and upon information and belief has received similar amounts for his services in 2007. Moreover, according to the 2007 Proxy, McGrath directly or indirectly controls 58,891 shares of the common stock of Schering.

23.     Defendant Carl E. Mundy, Jr. ("Mundy"), upon information and belief, is a resident of Virginia. Mundy has been a Managing Director of Schering since 1995. According to the 2007 Proxy, Mundy received $200,000 in total compensation for his services as Director of the Company in 2006 and upon information and belief has received similar amounts for his services in 2007. Moreover, according to the 2007 Proxy, Mundy directly or indirectly controls 42,291 shares of the common stock of Schering.

24.     Defendant Antonio M. Perez ("Perez"), upon information and belief, is a resident of New York. Perez has been a Director of Schering since 2007. Based on the Company's Director Compensation agreements, Perez is believed to have received $200,000 in total compensation for his services as Director of the Company in 2007 and upon information and belief will receive similar amounts for his services in 2008.

25.     Defendant Patricia F. Russo ("Russo"), upon information and belief, is a resident of New York. Russo has been a Director of Schering since 1995. According to the 2007 Proxy, Russo received $215,000 in total compensation for her services as Director of the Company in 2006, and upon information and belief has received similar amounts for her services in 2007. Moreover, according to the 2007 Proxy, Russo directly or indirectly controls 70,708 shares of the common stock of Schering.

26.     Defendant Jack L. Stahl ("Stahl"), upon information and belief, is a resident of Florida.  Stahl has been a Director of Schering since 2007.  Based on the Company's Director Compensation agreements, Stahl is believed to have received $200,000 in total compensation for his services as Director of the Company in 2007 and upon information and belief has received similar amounts for his services in 2008.

27.     Defendant Dr. Craig B. Thompson ("Thompson"), upon information and belief, is a resident of Pennsylvania.  Roberts has been a Director of Schering since 2008.  Based on the Company's Director Compensation agreements, upon information and belief Perez will receive $200,000 in total compensation for his services as a Director of the Company in 2008.

28.     Defendant Kathryn C. Turner ("Turner"), upon information and belief, is a resident of Virginia.  Turner has been a Director of Schering since 2001.  According to the 2007 Proxy Statement, Turner owns directly or beneficially 972 Common Shares of Schering. According to the 2007 Proxy, Turner received $200,000 in total compensation for her services as Director of the Company in 2006 and upon information and belief has received similar amounts for her services in 2007.  Moreover, according to the 2007 Proxy, Turner directly or indirectly controls 26,708 shares of the common stock of Schering.

29.     Defendant Robert F.W. Van Oordt ("Van Oordt"), upon information and belief, is a resident of The Netherlands.  Van Oordt has been a Director of Schering since 1992.  According to the 2007 Proxy, Van Oordt received $215,000 in total compensation for his services as Director of the Company in 2006 and upon information and belief has received similar amounts for his services in 2007.  Moreover, according to the 2007 Proxy, Van Oordt directly or indirectly controls 98,457 shares of the common stock of Schering.

30.     Defendant Arthur F. Weinbach ("Weinbach"), upon information and belief, is a resident of New Jersey.  Weinbach has been a Director of Schering since 1999.  According to the 2007 Proxy, Weinbach received $215,000 in total compensation for his services as Director of the Company in 2006 and upon information and belief has received similar amounts for his services in

2007. Moreover, according to the 2007 Proxy, Weinbach directly or indirectly controls 60,865 shares of the common stock of Schering.

## DEFENDANTS' DUTIES

31.     By reason of their positions as Directors and/or officers of the Company, the Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

32.     Each Director and/or officer of the Company owes to it and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as Directors and/or officers of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's products, revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

33.     The Defendants, because of their positions of control and authority as Directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, products and improper representations of the Company.

34.     At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of the Company, and was at all times acting within the course and scope of such agency.

35.     To discharge their duties, the Directors and officers of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of

the financial affairs of the Company. By virtue of such duties, the Directors and officers of the Company were required to, among other things:

a.      Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements;

b.      Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects;

d.      Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      Ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

36.      Each Defendant, by virtue of his position as a Director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as Directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were also officers and/or

Directors of the Company during the Relevant Period have been ratified by the remaining Defendants who collectively comprised all of the Company's Board during the Relevant Period.

37. The Defendants breached their fiduciary duties by failing to adequately oversee the Company's operations and business practices to ensure that the Company complies with all applicable laws, rules, and regulations.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38. In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39. During all times relevant hereto, Defendants collectively and individually initiated a course of conduct that was designed to and did deceive shareholders and the investing public regarding Schering's business operations, management and the intrinsic value of Schering common stock.

40. Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, Defendants caused the Company to conceal the true fact that the Company was misrepresenting the actual effectiveness of Zetia and Vytorin, and therefore misrepresenting Company's true financial state and future business operations and prospects.

41. The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' breaches of fiduciary duty, waste of corporate assets and unjust enrichment, and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

42. Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release misleading statements. Because the actions described herein occurred under the authority of the

Board, each of the Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

43.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

44.     As members of the Board, Defendants were themselves directly responsible for authorizing or permitting the authorization of, or failing to monitor, the wrongful practices alleged herein. Each of them had knowledge of and actively participated in and approved of the wrongdoings alleged or abdicated his responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing subjected Schering to unreasonable risks of loss.

45.     By reason of their membership on the Board and positions as executive officers of the Company, the Defendants were each controlling persons of Schering and had the power and influence to cause, and did cause, the Company to engage in and/or permit the conduct complained of herein.

## SUBSTANTIVE ALLEGATIONS

### Background

## ZETIA

46.     Zetia is an anti-hyperlipidemic brand-name prescription drug developed and patented by Schering. Zetia was first approved for and sold in the United States in or about November 1997. Zetia is in a class of lipid lowering compounds which selectively inhibit the intestinal absorption of cholesterol, which differs from other cholesterol lowering drugs, known as statins, which work in the liver.  Zetia purportedly lowers cholesterol levels in users, with the expectation that by lowering cholesterol Zetia has the positive health benefit of arresting and slowing the development of atherosclerotic disease, and therefore cardiovascular injury and mortality.  The generic name for Zetia's active ingredient is ezetimibe.

**ZOCOR**

47.     Zocor is a drug developed and patented by Merck.  Zocor was first approved for and sold in the United States in or about November 1997.  Zocor falls within the classification of drugs generally referred to as "statins."  Statins generally and Zocor specifically are inhibitors of HMG-CoA reductase which lowers cholesterol.  The intended health benefit of statin drugs generally and Zocor specifically is: (1) to reduce the risk of total mortality by reducing coronary heart disease death, (2) to reduce the risk of non-fatal myocardial infarction and stroke, and (3) to reduce the need for coronary and non-coronary revascularization procedures.

**VYTORIN**

48.     In or about 2004, Schering and Merck entered into a joint marketing agreement to develop market and sell a combination drug comprised of Zocor and Zetia to be called Vytorin.  It was each company's hope that this new combination drug would be competitive with Lipitor in an exploding cholesterol-lowering drug market which, according to Merck, would be worth $21 billion world-wide in 2004.

49.     Marketed  and advertised aggressively as  a superior alternative to statins including Lipitor in terms of its positive health benefits, Vytorin vaulted to a third place position in sales of cholesterol lowering drugs in 2005, its first full year of sales.  According to Schering, sales for the first half of 2007 exceeded $2.4 billion dollars.

**The Marketing of Zetia and Vytorin**

50.     Defendants allowed and/or caused Schering to consistently market Zetia to consumers and physicians as a drug that lowers LDL in a "different" manner, stressing that lowering LDL allegedly reduces or slows the buildup of plaque in arteries.  For example, the Zetia website, www.zetia.com, stresses that LDL cholesterol is bad because it allegedly builds up in the walls of arteries and forms plaque:

> Cholesterol is a type of fat found in your blood. Your total cholesterol is made up of LDL and HDL cholesterol.
>
> LDL cholesterol is called "Bad" Cholesterol because it can build up in the wall of your arteries and form plaque. Over

- 12 -

time, plaque buildup can cause a narrowing of the arteries. This narrowing can slow or block blood flow to your heart, brain, and other organs. High LDL cholesterol is a major cause of heart disease and stroke.

51.     The Zetia website also stresses that the drug is effective in lowering bad cholesterol:

**ZETIA when taken alone, along with a healthy diet, was proven to help lower Bad Cholesterol**.

A healthy diet and exercise are important, but sometimes they're not enough to get your cholesterol where it needs to be. ZETIA complements those efforts and, when added to a healthy diet, is proven to lower Bad Cholesterol. In a clinical study of people with high cholesterol, ZETIA lowered Bad Cholesterol by an average of 30 points—that's 18%.* These are average results. Individual results may vary.

\* At the start of the study, average Bad Cholesterol levels were 167 mg/dL for patients in the group receiving a placebo (a pill with no medicine) and for patients in the group receiving ZETIA.

\*\*\*

**Adding ZETIA to your statin, along with a healthy diet, was proven to help lower Bad Cholesterol.**

In a clinical study, people who added ZETIA to their statin medicine reduced their Bad Cholesterol by an additional 36 points (25%) compared with 6 points (4%) in people who added a placebo (a pill with no medicine).* These are average results. Individual results may vary.

\* At the start of the study, the average Bad Cholesterol levels were 139 mg/dL for patients in the group receiving statin + placebo vs 138 mg/dL for patients in the group receiving statin + ZETIA.

52.     Schering represents on one of its other current websites, www.vytorin.com, that Vytorin also is effective in treating high cholesterol:

**About VYTORIN**

The only product that:
- Helps block the absorption of cholesterol that comes from food, and
- Reduces the cholesterol your body makes naturally

- 13 -

The result is that less bad cholesterol ends up in your bloodstream.  And that's good for your health.

Vytorin can:
- Lower LDL (bad) cholesterol
- Lower total cholesterol
- Lower triglycerides (fatty substances in your blood)
- Raise HDL (good) cholesterol

53.     Before and throughout the Relevant Period, Defendants allowed and/or caused the Company to market Zetia and Vytorin as lowering "bad" cholesterol, while also claiming that the reduction of "bad" cholesterol decreases the buildup of plaque in arteries.

## The ENHANCE Study and Results

54.     In or about 2004, Schering and Merck commenced the ENHANCE study of Zetia and Vytorin in order to prove that Zetia and Vytorin would be effective in reducing accumulation of fatty plaque in patients' arteries.

55.     As the Wall Street Journal reported in an article on January 17, 2008, "At the time, cardiologists were asking Schering and Merck to show that Zetia - which works differently from highly popular statins -  didn't just lower cholesterol but also helped patients live longer and prevented heart attacks. Large studies looking at such outcomes take a long time and the Enhance study offered an interim look that focused on how much plaque formed in the arteries of Vytorin users."

56.     The ENHANCE study was designed by Schering and Merck to prove that Vytorin could slow the growth of plaque in carotid arteries, which supply blood to the brain, more than simvastatin alone.  The trial studied 720 people with heterozygous familial hypercholesterolemia, an inherited form of high cholesterol that affects about 0.2% of the population. The study pitted Vytorin against simvastatin, which is the generic name for Zocor. (Vytorin consists of Zocor, a statin, and Zetia.)

57.     The ENHANCE study was completed in April 2006 but the Company did not release any results in either 2006 or 2007.

58.     In November 2007, Schering announced that they had changed the ENHANCE study's "primary endpoint," i.e., the main medical result being measured.  Specifically, the Company stated that the study would focus on the common carotid artery.  Previously, the stated primary objective of the ENHANCE study was to measure changes at three points of the carotid artery – the internal carotid, the carotid bulb and the common carotid - at the beginning of the study and after two years.  After an outpouring of criticism, the Company announced that the primary endpoints would not be changed.  However, the Company still did not release any results of the trial.

59.     Finally, on January 14, 2008, Defendants caused the Company to issue a press release to announce results of the ENHANCE study.

60.     According to the announcement, the ENHANCE researchers found that while Vytorin lowered LDL more than simvastatin alone, it did not slow the growth of carotid-artery plaques more than simvastatin, a statin now available as a much less expensive generic. (As explained above, Vytorin consists of simvastatin, which is sold as Zocor, and Zetia.)  In fact, the patients who took Vytorin had slightly more plaque growth than the patients who took simvastatin alone.

61.     Thus, the ENHANCE study contradicts the Company's claim that by lowering LDL, Zetia also reduces the buildup of arterial plaque. As MedPage Today reports, Dr. Steven Nissen (chairman of cardiovascular medicine at the Cleveland Clinic and a past president of the American College of Cardiology) "said the ENHANCE results, issued today as a press release, were stunning, adding that on the basis of this evidence there was no good reason to prescribe ezetimibe [i.e., Zetia], because `if it doesn't work in [heterozygous familial hypercholesterolemia], why use it'"?

62.     Moreover, there is no evidence of any kind to support a claim that Zetia reduces (or slows the buildup of) arterial plaque. In an article dated November 21, 2007, the New York Times quoted Dr. Eric J. Topol, a cardiologist and director of the Scripps Translational Science Institute in La Jolla, California, as saying, "Statins have diverse effects beyond simple LDL cholesterol lowering, such as potent anti-inflammatory actions. There has yet to be a clinical trial to show that ezetimibe improves clinical outcomes."

63.     In the week after the disclosure of the results of the ENHANCE study, Schering's share price value dropped approximately 23.2%.

### Effect of the ENHANCE Study on Schering's Marketing

64.     As explained above, Defendants have allowed and caused the Company to tout that Zetia is different, claiming that it lowers "bad" cholesterol, which Defendants claim would in turn reduce arterial plaque.  But the "different" way that Zetia lowers LDL provides no benefit at all to patients, according to the ENHANCE study.

65.     Despite the results of the ENHANCE study, Defendants continue to allow Schering to persist with this marketing approach.  In particular, the websites for Vytorin and Zetia continue to market those drugs as reducing "bad" cholesterol, which in turn they assert reduces the buildup of arterial plaque, a claim that is directly refuted by the ENHANCE study.

### RULE 23.1 DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

66.     Plaintiff hereby incorporates ¶¶ 1 – 66 above.

67.     Plaintiff is and has been a shareholder of Schering stock during the Relevant Period.

68.     This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.  Plaintiff will adequately and fairly represent the interests of Schering and its shareholders in enforcing and prosecuting their rights.

69.     The Board (or at the very least a majority of it) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow in ¶¶ 70-80 of this Complaint, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

70.     The Board participated in and/or approved many acts and omissions alleged herein or was on notice of the acts and omissions and then in an intentional, reckless, or grossly negligent manner disregarded the wrongs complained of herein.

71.     The acts complained of herein constitute violations of fiduciary duties owed by the Board and these acts are incapable of ratification.

- 16 -

72.     The Board cannot be relied upon to reach a truly independent decision as to whether to consider a demand for action against themselves and the officers responsible for the misconduct alleged in this Complaint, in that, *inter alia*, the Board is dominated by Defendants who were personally and directly involved in the misconduct alleged and/or who each approved the actions complained of here.  This domination of the Board has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

73.     In order to bring this action for breaching their fiduciary duties, each of the Defendants would have to sue himself/herself and/or his/her fellow Directors and allies in the top ranks of the Company, who are his/her good friends and with whom he/she has entangling financial alliances, interests and dependencies, which each Director of the Board would not do.  Therefore, the Board would not be able to vigorously prosecute any such action and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves and one another.

74.     The Defendants named herein, receive payments, benefits, stock options and other emoluments by virtue of their membership on the Board and their control of Schering.  They have thus benefited from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

75.     Reasonable doubt exists as to whether the Board can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein.  According to the Company's 2007 Proxy, the Company readily acknowledges that defendants Hassan and Leder are not independent Directors under the NYSE standards, because of their personal, professional, and financial entanglements with each other and the Company.

76.     Reasonable doubt exists as to whether defendant Hassan can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein.  As the CEO and President of the Company, Defendant Hassan is responsible for directing the Company's day-to-day

operations and for overseeing its corporate development and strategic planning.  Hassan was therefore an integral cog in Defendants' plan to suppress the findings of the ENHANCE study for nearly two years.  Moreover, Hassan is financially beholden to the Company.  For example, the Company paid Hassan over $$29,657,926 in total compensation for his service as CEO and President in 2006.  As a result, in accordance with the New York Stock Exchange listing standards, Defendant Hassan is not independent.

77.  Reasonable doubt exists whether Defendant Leder can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein.  Defendant Leder has personal and professional entanglements with the Company.  Leder's son, Ethan Leder, is chief executive officer of United BioSource Corporation, which provides specialized pharmaceutical services, including pharmacoeconomic information and analysis. Schering-Plough, for many years, has obtained services from companies that are part of the United BioSource family of companies.  During 2006, Schering-Plough business with these companies totaled approximately $1.6 million.  During 2005, Schering-Plough business with these companies totaled approximately $2.3 million, which was between 3% and 4% of UBC's annual gross revenues for fiscal year 2005.  As a result of these transactions, Defendant Leder is not independent.

78.  Reasonable doubt exists whether Defendant Weinbach can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein.  The Company entered into a contract with a company controlled by Weinbach's son for certain human resource communications services.  At the time, Weinbach owned 12.5% of that company.  The total payments made by the Company under the contract were $153,150.  The contract was terminated in 2002.

79.  Reasonable doubt exists whether Defendant Kidder can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein.  Defendant Kidder holds close alliances with and allegiances to interested Director, Hassan and is beholden to him for his position on the Schering Board.  Defendant Kidder served on the board of Electronic Data Systems Corporation ("EDS") with Hassan.   In October 2005, Kidder left the EDS board.  On

December 5, 2005, just two months later, Schering announced that the Company elected Kidder to its Board of Directors.   In making the announcement Hassan stated, "Bob [Kidder] brings broad experience in the management of complex global organizations and sophisticated financial transactions.  His experience and good judgment will be important as we move forward with new phases of our Action Agenda to transform Schering-Plough into a high-performance, global competitor."  Defendant Kidder's relationship with Hassan enabled him to be nominated and elected to the Schering Board, where he now receives $200,000 a year in total compensation for his services.

80.     Reasonable doubt exists whether Defendants Leder, McGrath, Thompson and Turner, as members of the Company's Science & Technology Committee, can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein.  The Science & Technology Committee functions include assisting the Board of Directors in the general oversight of science and technology matters that impact Schering's business and products.  According to its charter, in carrying out its function, the Committee may undertake such activities as it deems useful, which may include providing input to the Board regarding the scientific aspects of the Company's R&D portfolio and how developments in science and technology may impact the Company.  Despite each member of the Science & Technology Committee being charged with overseeing and reporting on how scientific developments could impact the Company and its products, defendants Leder, McGrath, Thompson and Turner have failed to adopt an acceptable oversight and reporting process that is in the best interest of the Company, as evidenced by the fact that these Defendants allowed and/or caused the Company to suppress the unfavorable results of the ENHANCE study for nearly two years.  By failing to perform their duties as prescribed by their charter and subjecting the Company to significant losses, Defendants Leder, McGrath, Thompson and Turner are personally implicated by the allegations contained herein and they would have been unable to comply with their fiduciary duties to disinterestedly consider pre-suit demand of the allegations contained here.

**FIRST CAUSE OF ACTION**

**For Breaches of Their Fiduciary Duties of Loyalty, Due Care and Good Faith**
(Against All Defendants)

81.     Plaintiff incorporates by reference each of the foregoing allegations.

82.     The Defendants are fiduciaries of Schering and of all of its public shareholders and owe to them the duty to conduct the business of the Company loyally, with due care and in good faith.  This cause of action is asserted based upon the Defendants' intentional, reckless or grossly negligent acts, which constitute breaches of their fiduciary duties of loyalty, due care and good faith and waste of the Company's corporate assets, in violation of state law.

83.     The Defendants, in their roles as executives and/or Directors of the Company, participated in the acts of mismanagement alleged herein, or acted in reckless disregard of the facts known to them, and failed to exercise due care to prevent the violation of the federal securities and consumer protection laws.  Specifically, the Defendants caused the Company to suppress the results of the ENHANCE study, which contradicted the Company's public statements about Zetia and Vytorin.  The Defendants became aware, or should have become aware through reasonable inquiry, of the facts alleged herein, but Defendants did nothing to correct these false statements and omissions and thereby breached their duty of care, loyalty, accountability and disclosure to the shareholders of the Company.

84.     As a direct and proximate result of Defendants' wrongful conduct, Schering has suffered considerable damage and a drastic diminution in value.

85.     All Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

86.     The Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their high-level positions in the Company.

87.     By reason of the foregoing, the Defendants have breached their fiduciary obligations to Schering and its shareholders.

88.     Schering and its shareholders have been injured by reason of the Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and representative of Schering, seeks damages and other relief for the Company as hereinafter set forth.

## SECOND CAUSE OF ACTION

### For Gross Mismanagement
(Against All Defendants)

89.     Plaintiff incorporates by reference each of the foregoing allegations.

90.     Defendants have been responsible for the gross mismanagement of Schering. Defendants have also failed to exercise independent or good faith oversight of Scheing or its executives, and thus have permitted that gross mismanagement.

91.     Defendants abdicated their corporate responsibilities by mismanaging the Company in at least the following ways:

a.     They caused Schering to violate the federal securities laws and state consumer protection statutes;

b.     They concealed from the Company's shareholders their plans to suppress the results of the ENHANCE study; and

c.     They subjected Schering to adverse publicity, greatly increased its costs to raise capital, and impaired its earnings.

92.     By their actions, Defendants breached their duties to oversee, direct and control Schering in a manner consistent with the legal duties of directors and officers of a publicly held company and under the applicable state laws.

93.     As a direct and proximate result of Defendants' gross mismanagement as alleged herein, Schering has sustained damages.

## THIRD CAUSE OF ACTION

### Derivative Claim For Waste Of Corporate Assets
(Against All Defendants)

94.     Plaintiff incorporates by reference each of the foregoing allegations.

95.     As a direct result of wrongdoing alleged herein, Defendants have unreasonably and unnecessarily caused Schering to expend hundreds of millions of dollars of corporate assets to the extreme detriment of the Company.

96.     As a direct and proximate result of Defendants' waste of corporate assets as alleged herein, Schering has sustained damages.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff demands judgment on behalf of Schering as follows:

A.     Against each Defendant for restitution and/or damages in favor of Plaintiff, on behalf of Schering and its public shareholders, and awarding punitive and exemplary damages as appropriate, plus pre-judgment interest, modeled in a fashion to ensure Defendants do not participate therein or benefit thereby;

B.     Awarding Plaintiff on behalf of Schering equitable and/or injunctive relief, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Schering has an effective remedy;

C.     Directing Schering to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, as well as all other legal requirements to protect the Company and its shareholders from the damaging effects described herein;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees, costs and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: February 25 , 2008                          SCOTT + SCOTT, LLP

                                                    By: /s/Judy Scolnick
                                                        29 West 57th Street
                                                        New York, NY 10019
                                                        Telephone: 212-223-6444
                                                        Facsimile: 212-223-6334
                                                        jscolnick@scott-scott.com

SCOTT + SCOTT, LLP
David R. Scott
108 Norwich Ave.
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile: 860-537-4432
drscott@scott-scott.com

SCOTT + SCOTT, LLP
Arthur L. Shingler III
600 B St., Suite 1500
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
ashingler@scott-scott.com

and

BECKWITH & WOLF, LLP
By:/s/Carl Beckwith (CB 9044)
1 Closter Commons #181
Closter, NJ 07624
Telephone:201-338-2833
Facsimile: 201-839-4558
ccbeckwith@gmail.com

<u>CERTIFICATION</u>

I hereby certify that the matter in controversy is not the subject of any other court, arbitration or

administrative proceeding.


By: <u>/s/Carl Beckwith</u>

## VERIFICATION

I, MARY E. CAIN, hereby declare and verify that I was a shareholder of Schering-Plough Corporation at the times the misconduct complained of in the Verified Derivative Complaint for Breach of Fiduciary Duties and Waste of Corporate Assets ("Complaint") occurred. Additionally, I have reviewed the allegations made in the Complaint and I believe the matters therein are true and correct to the best of my knowledge, information and belief. Having received a copy of this Complaint, having reviewed it, I have authorized its filing and declare under penalty of perjury that the foregoing is true and correct.

Executed this 17 day of February, 2008, at _Tiffin_ , _Georgia_ .
                                              (City)      (State)

_____
MARY E. CAIN